# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | **PRESENTENCE INVESTIGATION REPORT** |
| | ) | |
| | ) | **Docket No.:**    **DNYN 8:14CR000360-001** |
| **Archie Rafter** | ) | |
| | ) | **Charging**      **Information** |
| | | **Document:** |

**Prepared for:**      The Honorable Mae A. D'Agostino
U.S. District Judge

**Prepared by:**      Edward M. Cox
Senior U.S. Probation Officer
Albany, NY
518-257-1731
ed_cox@nynp.uscourts.gov

**Assistant U.S. Attorney**                **Defense Counsel (Retained)**
Katherine E. Kopita                        Daniel DeMaria
14 Durkee Street, Room 340           Merchant Law Group LLP
Plattsburgh, NY 12901                26 Broadway, 21st Floor
518-314-7800                          New York, NY 10004
katherine.kopita@usdoj.gov          212-658-1455
                                        ddemaria@nyslitigators.com

**Sentence Date:**      February 29, 2016 at Albany

**Offense:**             <u>**Count 1**</u>:
Conspiracy to Possess and Distribute Marijuana
21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A)
10 years to life imprisonment/$10,000,000 fine
(Class A Felony)

**Release Status:**      Detained continuously since October 25, 2013 arrest

**Detainers:**      United States Immigration and Customs Enforcement

**Codefendants:**      None.

**Date Report Prepared:** March 25, 2015            **Date Report Revised:** October 27, 2015

**Related Cases:**       Lee Smith, 8:12-CR-000406-001, Pending.

Stacie Demers, 8:12-CR-000406-003, Pending.

Andrew Schueppel, 8:12-CR-000406-004, Pending.

Ralph Dumas, 8:12-CR-000406-005, P.G. to Conspiracy to Possess and Distribute Marijuana on 05/22/2014.  Sentence Pending.

Robert Swartenburg, 8:12-CR-000406-006, Pending.

James McLernon, 8:12-CR-000406-007, P.G. to Conspiracy to Possess and Distribute Marijuana on 05/14/2014.  Sentence Pending.

Paul Southworth, 8:12-CR-000130-001, P.G. to Conspiracy to Possess and Distribute Marijuana on 03/27/2012.  Sentence Pending.

Stephane Dorey, 8:10-CR-000534-001, P.G. to Possession and Distribution of Marijuana on 04/19/2011.  Sentenced to 14 months Incarceration and 2 years Supervised Release on 12/08/2011.

Lisa Joy, 8:12-CR-000064-001, P.G. to Conspiracy to Possess and Distribute Marijuana on 02/15/2012.  Sentenced to Time Served and 4 years Supervised Release on 04/03/2014.

Gregory Cromp, 5:10-CR-000143-001, P.G. to Conspiracy to Possess and Distribute Marijuana on 03/30/2010.  Sentenced to Time Served (1 day), 3 years Supervised Release (with 6 months Home Confinement) and a $3,500 Fine on 01/12/11.

**Identifying Data:**

| | |
|---|---|
| **Birth Name:** | Archille John Rafter |
| **Date of Birth:** | March 24, 1963 |
| **Age:** | 52 |
| **Race:** | White |
| **Hispanic Origin:** | Non-Hispanic |
| **Sex:** | Male |

| | |
|---|---|
| **SSN#:** | 261-165-419 (Canadian) |
| **FBI#:** | 888654WD4 |
| **USM#:** | 21019-052 |
| **PACTS#:** | NNY 326283 |

| | |
|---|---|
| **Education:** | High School Graduate |
| **Dependents:** | Three Adult Children |
| **Citizenship:** | Canadian |
| **Immigration Status:** | Paroled into the United States |
| **Place of Birth:** | Huntington, Quebec, Canada |

**Current Address:**   Rensselaer County Jail
4000 Main Street
P.O. Box 389
Troy, New York 12180

**Legal Address:**   2250 First Concession(c/o Kelly Rafter)
Elgin, Quebec, Canada J0S 2E0

**Alias(es):**   "Archie"

**Alternate IDs:**   None.

***Restrictions on Use and Redisclosure of Presentence Investigation Report.*** Disclosure of this presentence investigation report to the Federal Bureau of Prisons and redisclosure by the Bureau of Prisons is authorized by the United States District Court solely to assist administering the offender's prison sentence (i.e., classification, designation, programming, sentence calculation, pre-release planning, escape apprehension, prison disturbance response, sentence commutation, or pardon) and other limited purposes, including deportation proceedings and federal investigations directly related to terrorist activities. If this presentence investigation report is redisclosed by the Federal Bureau of Prisons upon completion of its sentence administration function, the report must be returned to the Federal Bureau of Prisons or destroyed. It is the policy of the federal judiciary and the Department of Justice that further redisclosure of the presentence investigation report is prohibited without the consent of the sentencing judge.

## PART A. THE OFFENSE

### Charge(s) and Conviction(s)

1.      On January 9, 2015, pursuant to a written Rule 11(c)(1)(A) plea agreement, the defendant pled guilty to a single count Information which charges Conspiracy to Possess and Distribute Marijuana, in violation of 21 U.S.C. §§ 846 and 841(a)(1).  More specifically, the Information charges that from in or about 2004 to on or about October 23, 2013, in Franklin County, New York, and elsewhere, the defendant, Archie Rafter, and others conspired to knowingly and intentionally possess with intent to distribute and to distribute a controlled substance.  As to defendant Archie Rafter, that violation involved 1,000 kilograms or more of a mixture and substance containing a detectable amount of marijuana, a schedule I controlled substance.

2.      The defendant was originally charged in a two count Indictment, DNYN8:13-CR-406.  He is named in both counts.  Count 1 charges from 2004 to present (Indictment filed October 23, 2013), in Franklin and Ulster Counties, New York and elsewhere, defendants Lee Smith, Archie Rafter, Stacie Demers, Andrew Schueppel, Ralph Dumas, Robert Swartenburg, James McLernon and others conspired to knowingly and intentionally possess with intent to distribute and to distribute a controlled substance.  That violation involved 1,000 kilograms or more of a mixture and substance containing a detectable amount of marijuana, a Schedule I controlled substance.  Count 2 charges that between June 14, 2013 and June 19, 2013, the defendant and Stacie Demers aided, abetted, counseled, commanded, induced, and procured the commission of the possession of marijuana with the intent to distribute by Robert Swartenburg and James McLernon.  The plea agreement notes that upon imposition of a sentence consistent with the terms of the plea agreement, the Government will move to dismiss all charges against the defendant in Indictment DNYN8:13-CR-406.  Such dismissal will be without prejudice, permitting the government to seek reinstatement of any and all of those charges if the guilty plea and sentence do not remain in effect.

3.      Within the plea agreement, the defendant admits the following facts which demonstrate his guilt in the offense of conviction:

> From at least 2004 until October 23, 2013, the defendant participated in a large scale drug trafficking organization (the organization) operating in the Northern District of New York, Quebec, Canada and elsewhere.  The primary purpose of the organization was to smuggle large quantities of high-grade Canadian marijuana into the United States and deliver the marijuana to wholesale drug dealers (the dealers) in various locations in the northeastern United States.  The organization used several ways to smuggle the marijuana across the international boarder.  The primary manner, however, was to smuggle marijuana through the properties of co-defendants Andrew Schueppel and Lee Smith.  Schueppel owns farm land adjacent the border in Quebec, Canada and, directly adjacent to Schueppel's property, Smith owns more than 100 acres of land in Constable, New York, which is also adjacent to the border.

The defendant's primary role within the organization was to broker marijuana transactions. The defendant, through his connections in Montreal, Quebec, Canada, was able to acquire large quantities of marijuana that the organization would smuggle into the United States. The defendant directly coordinated with the dealers to arrange a time and location for the delivery of marijuana loads. The defendant also coordinated with the organization's couriers, especially co-defendant Ralph "Sonny" Dumas.

Typically, once the defendant has a load of marijuana ready to be delivered, he and Dumas would arrange for the load to be delivered to Schueppel's property. The organization would usually smuggle 100 to 150 pounds of marijuana per trip. Once Schueppel transported the load of marijuana across the border to Smith's property, the marijuana would be stored on Smith's property or on the property of co-defendant Stacie Demers, Smith's daughter. Demers also own property adjacent to Smith's property and in close proximity to the border. Dumas and another co-conspirator would retrieve the load of marijuana from Smith or Demers and deliver it to dealers, including co-defendant Robert Swartenburg, a/k/a "Fred."

On June 14, 2013, the defendant informed Dumas that he had a load of 100 pounds of marijuana ready to be delivered and provided contact information for the dealer. On or about June 17, 2013, the defendant arranged for the load of marijuana to be delivered to Schueppel at his residence near the Canadian border. Schueppel transported the load of marijuana across the border to Smith's property and, ultimately, the load of marijuana was stored in a shed on Stacie Demers' property. On June 18, 2013, at the direction of the defendant, Dumas retrieved the load of marijuana from Demers' shed.

On June 19, 2013, an undercover officer transported the load of marijuana to James McLernon's residence in Saugerties, New York. While at the residence, McLernon and Swartenburg took possession of the load of marijuana.

From in or about 2004 until October 23, 2013, the defendant coordinated the delivery of marijuana loads, on average, several times per month. Typically, the organization smuggled at least 100 to 150 pounds of marijuana per trip. The parties agree that the defendant is personally accountable for 1,000 kilograms or more of marijuana, in that the defendant was personally involved with that quantity or it was reasonably foreseeable to the defendant that the conspiracy involved that quantity.

4.    The plea agreement contains the following sentencing stipulations:

(a) The parties agree that the defendant is personally accountable for 1,000 kilograms or more of marijuana, in that the defendant was personally involved with that quantity or it was reasonably foreseeable to the defendant that the conspiracy involved that quantity. The corresponding base offense level is 32

[within the 2014 edition of the Guidelines Manual this quantity actually yields a base offense level of 30].

(b) The government will recommend a 2-level downward adjustment to the applicable federal sentencing guidelines offense level pursuant to U.S.S.G. §3E1.1(a) if, (i) through the time of sentencing, the government is convinced that the defendant has demonstrated "Acceptance of Responsibility" for the offense(s) to which the defendant is pleading guilty; and (ii) the government does not determine that the defendant, after signing this agreement, committed any other federal, state, or local crimes, or engaged in conduct that constitutes "Obstruction of Justice," as defined in U.S.S.G. §3C1.1.

(c) The government will move for a 1-level downward adjustment to the applicable federal sentencing guidelines offense level, pursuant to U.S.S.G. §3E1.1(b), if the government is convinced that the defendant has accepted responsibility within the meaning of U.S.S.G. §3E1.1(a) and further assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the defendant's intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, and the defendant otherwise qualifies for such adjustment by having a combined offense level of 16 before receipt of any acceptance of responsibility adjustment under U.S.S.G. §3E1.1(a).

5.   The defendant waives the right to appeal or collaterally attack his conviction and: (a) any sentence of imprisonment of 151 months or less; (b) any sentence to a fine within the maximum permitted by law; and, (c) any sentence to a term of supervised release within the maximum permitted by law.

6.   Rafter was arrested on October 25, 2013 and has been detained continuously since that time.

**<u>The Offense Conduct</u>**

7.   In approximately 2008, the Drug Enforcement Administration (DEA) began an investigation of Lee Smith and his associates.  Based on this investigation, it became apparent that Smith's property was a hub for international marijuana smuggling activities. It was learned that drug trafficking organizations hire Smith and his associates to facilitate the flow of drugs and currency into and out of the United States.  Smith's property consists of several acres of farmland that abut the international border in an isolated and remote section of Constable, New York.  The property contains a residence, a junkyard, and trails that provide direct access to Canada.

8.   It was further discovered Smith works in conjunction with Andrew Schueppel, the owner of a farm adjacent to Smith's property in Canada.  Organizations deliver large quantities of marijuana to Schueppel and he thereafter transports the marijuana from his residence in Canada to Smith in the United States.  Smith either stored the marijuana on his

property until a courier picked up the marijuana or caused the marijuana to be delivered to the residence of one of his children, to include codefendant Stacie Demers. Once the marijuana arrived in the United States it would be transported to metropolitan areas along the east coast including, but not limited to, Providence, Rhode Island; Burlington, Vermont; Philadelphia, Pennsylvania; New York, New York; Albany, New York; Atlanta, Georgia; and Danbury, Connecticut.

9.    On December 18, 2008, the DEA conducted an operation targeting Gregory Cromp, who was suspected to be involved in the transportation of marijuana for this organization. On that date, a traffic stop was conducted on Interstate 81 in Cicero (Onondaga County), New York of a Lincoln Town Car being operated by Cromp, who was the sole occupant of the vehicle. While speaking with Cromp, the officers who conducted the traffic stop noticed an odor of marijuana emanating from the vehicle. Cromp provided consent to search the vehicle which resulted in the discovery of two large duffle bags in the trunk. The duffle bags contained a total of approximately 100 pounds of marijuana.

10.   In October of 2010, the DEA utilized a cooperating defendant to place a series of recorded calls to a known marijuana supplier connected to this organization in Quebec, Canada. Based on the recorded calls, members of the DEA and Homeland Security Investigations (HIS), believed that a load of marijuana would be delivered to "Chelos Restaurant" near Providence, Rhode Island on October 23, 2010. On October 23, 2010, members of the DEA and HIS set up surveillance at the restaurant. During the course of their surveillance, agents observed a 2010 Dodge Caravan park in the lot. Stephane Dorey, a Canadian citizen, exited the vehicle and began unloading multiple large hockey bags from the Caravan. Agents arrested Dorey and recovered four hockey bags containing approximately 114 pounds of marijuana.

11.   On November 1, 2010, U.S. Border Patrol agents were conducting surveillance in the vicinity of Lee Smith's farm. At approximately 12:40 pm, agents observed an all-terrain vehicle (ATV) traveling south across the international border near Smith's residence. The ATV was loaded with several hockey-style bags which are often used to transport large quantities of marijuana. The driver of the ATV crossed the international border and stopped for a period of time near a grove of trees. The ATV then approached the rear of Smith's residence and the ATV driver stopped and was observed speaking with Smith. The agent attempted to interdict and apprehend the driver of the ATV, but the ATV fled back into Canada. Another agent went to the grove of trees where the ATV had stopped and discovered a hockey-style bag that contained marijuana. Thereafter U.S. Border Patrol agents coordinated with members of the Royal Canadian Mounted Police (RCMP) in an effort to identify the driver of the ATV. Later on November 1, 2010, the RCMP contacted the Border Patrol and asked them to travel to the residence of Andrew Schueppel, which is located just across the Canadian border and abuts Smith's farm. Upon arrival, the Border Patrol agents identified Schueppel as the individual they had observed on the ATV earlier in the day.

12.　Members of the RCMP and United States Border Patrol conducted an interview of Schueppel.  During this interview, Schueppel admitted he was, in fact, operating the ATV earlier in the day and was transporting a load of marijuana.  While crossing the border, Schueppel dropped one of the bags because it was falling off the ATV.

13.　After the initial encounter at Smith's residence, members of the DEA cordoned off the residence and obtained a search warrant.  Lee Smith, his wife, two adult children, and Michael Fenner were present at the residence.  During the search, agents recovered, among other things, two cellular phones, a micro bug detector, a Phoenix Arms .22 caliber pistol, a Firestorm .40 caliber pistol, an Arminius .32 caliber revolver, a Keltec .32 caliber pistol, and a United States Customs supervisor manual.

14.　Between 2010 and 2013, members of the DEA debriefed multiple confidential informants with regard to the activities of this organization. One such informant was interviewed on multiple occasions during 2010 and indicated he/she had begun transporting loads of marijuana for Lee Smith in approximately 2001.  During the four or five years the informant transported marijuana for Smith, he/she delivered marijuana to four or five different wholesale dealers in various states and would return with large quantities of currency which represented payment for the marijuana.  This money would be provided to Smith.  The informant made at least one or two deliveries per month and worked approximately six months per year.  Each load weighed between 25 and 100 pounds.  Smith paid the informant approximately $4,000 per load, regardless of the amount of marijuana he/she was transporting.  Approximately six months after the informant began working for Smith, he/she met Andrew Schueppel and observed Schueppel delivering loads of marijuana to Smith's junkyard.   On several occasions, Smith's children, including codefendant Stacie Demers, helped load marijuana into the informant's vehicle.

15.　Another informant was interviewed on multiple occasions in 2011 and 2012 and reported having begun smuggling drugs for Lee Smith and members of Smith's family in approximately 2006.  The informant advised that loads of Canadian marijuana were being delivered to the residence of Andrew Schueppel on the Canadian side of the border and thereafter transported across the international border to Smith's property.  Once the load of marijuana arrived at Smith's property, the marijuana would then be stored at either Smith's property or the property of one of his children, including, but not limited to, codefendant Stacie Demers.  The informant began working as a "blocker" (a vehicle that scouts ahead of load vehicles in an attempt to identify law enforcement activity in the area).  Eventually, the informant began transporting loads of marijuana for Lee Smith and Ralph Dumas at least once per month, with a typical load weighing 100 to 150 pounds. The informant explained Dumas owned a tractor trailer company in Malone and used his tractor trailers to pick up loads of marijuana from the Smith farm.

16.　On multiple occasions in 2011 and 2012, the DEA interviewed another confidential source who provided the following information.  The informant indicated he/she is a tractor trailer driver and worked for M&S Freight in Mooers, New York.  Sometime in 2003, Ralph Dumas, a dispatcher for M&S Freight, approached the informant about earning extra money.   The informant agreed, and within a couple months was transporting loads of marijuana at Dumas' direction.  Initially, the informant would pick

of loads of marijuana from John MacDonald and Dumas at M&S Freight.  The loads of marijuana varied between four and six bags with each bag weighing between 35 and 50 pounds.  Typically, once the informant delivered the marijuana to the wholesale dealers, they would provide him/her with a large quantity of currency to return to Dumas.  Sometime in 2003 or 2004, the informant began picking up loads of marijuana from Dumas' residence and other locations, such as from Lee Smith's daughter's house in Malone.  After approximately one year of using Smith's daughter's residence, Dumas and others decided to stop trafficking marijuana.   Approximately one year later, Dumas contacted the informant, inquiring whether he/she wanted to start working for the organization again.  Thereafter, the informant began picking up loads from Lee Smith's son.  The marijuana was stored in a locked trailer on the property and Dumas had a key to the trailer.   Eventually the organization stopped using this residence because an individual transporting marijuana on an ATV to this location was shot by members of the United States Border Patrol on May 5, 2008 and fled to this residence.  After this shooting, the organization began using Stacie Demers' residence which was located next to her father's (Lee Smith) in Constable.  The marijuana at this location was typically kept in a wood shed behind the residence and Dumas had a key to the shed.  The informant also detailed how Smith coordinated with a farm owner on the Canadian side of the border to smuggle marijuana into the United States to his property.  The informant picked up marijuana from Smith's residence on at least two or three occasions and delivered currency from marijuana proceeds directly to Smith on an estimated three to five occasions.  During the course of the conspiracy, the informant picked up loads of marijuana between one and three times per week and each load consisted of four to six hockey bags, weighing 35 to 50 pounds per bag.

17.     In early 2013, members of the DEA interviewed a confidential source who provided the following information.    From approximately 2000 until December of 2012, the confidential source worked for a drug trafficking organization that smuggled large quantities of marijuana from Canada to the United States.  He/she reported they had originally been recruited to participate by John MacDonald, owner of M&S Freight.  MacDonald worked with his brother, **Archie Rafter**, to acquire large quantities of marijuana from sources in Montreal, Quebec.   Initially, the confidential source had picked up loads of marijuana from MacDonald at M&S Freight.  However, there was a fire at M&S Freight and thereafter the confidential source began picking up loads of marijuana at Lee Smith's residence.  During his/her participation in the organization, the informant routinely picked up loads of marijuana from Smith's residence in Constable.  Typically, **Rafter** would contact him/her to inform that "something" was coming down, which was understood to mean that a load of marijuana was being smuggled into the United States from Canada.  Shortly thereafter, Smith would contact the informant by telephone and tell him that his "auto parts" (code for marijuana) were ready for pickup.  The marijuana was usually stored in a truck located in Smith's junkyard behind the residence.  Smith also kept loads of marijuana in a shed near the residence which had a false wall to conceal the marijuana.  Smith was usually present when the informant picked up the load of marijuana and helped load it into his/her car.  Smith's daughter, Stacie Demers, was also often present and helped load the marijuana into the informant's vehicle.  The informant estimated having picked up loads of marijuana (100 to 200 pounds per occasion) from Smith's residence more than 150 times.  While the informant

usually picked up the marijuana from Smith's residence, he also picked up loads from other locations associated with the Smith family.

18.     In February of 2013, at the direction of law enforcement, the informant began communicating with **Archie Rafter** through text messages.  During one of the text exchanges between the informant and **Rafter**, it appears **Rafter** is asking the informant to act as a "blocker" for loads of marijuana for $1,000 per trip.  **Rafter** also acknowledges having met with his source of supply ("Mr. Big") and reports a desire to begin smuggling marijuana into the United States as soon as the snow has melted.  During a later text exchange between the informant and **Rafter,** it appears the pair discuss several details pertaining to their smuggling operation and to make sure the informant and driver are ready to start transporting ("Well, do you have your crew all set and ready").  **Rafter** indicates the weather is the only thing holding them up at that point ("things are starting to happen, just waiting on the weather").  **Rafter** also discusses concerns with allowing the marijuana to "sit" with "Rev" (a reference to Lee Smith) after being transported across the border ("I don't trust the fuckin "Rev" to sit in this stuff anymore than we have to").

19.     On June 14, 2013, the informant received an incoming text message from **Rafter** indicating that **Rafter** had a "job" for the informant.  **Rafter** provided the informant with a cellular telephone number of the customer to arrange for the delivery of the load of marijuana.  On June 17, 2013, the informant contacted the DEA to inform that Stacie Demers had visited his residence and provided him/her with a key to a locked storage room located at the rear of Demers' residence in Constable.  Demers told the informant, "You know what to do."

20.     On June 18, 2013, the DEA Task Force conducted an operation to utilize the informant to pick up a load of marijuana from Demers' residence.  The informant used the key previously provided to him by Demers to access the locked storage room on her property.  The informant then retrieved two hockey-style bags from the storage area and delivered them to a predetermined location where they were field tested by the DEA and tested positive for THC (marijuana).  The two bags of marijuana weighed a total of approximately 100 pounds.  One of the Task Force agents, acting in an undercover capacity, thereafter called an unidentified male to coordinate the delivery of the marijuana.  It was agreed that the undercover agent would meet the customer at a gas station near the Saugerties exit (Exit 20 off Interstate 87).  The customer indicated from there it would be a short ride to the final destination.  Upon arrival at the gas station, the undercover agent met a 2012 Honda Accord occupied by two males who were later identified as Robert Swartenburg and James McLernon and followed the vehicle to McLernon's residence located at 369 West Saugerties Road, Saugerties.  The undercover agent and Swartenburg unloaded the two bags from the car being used by the agent and carried them to a building next to McLernon's main residence.  Swartenburg offered to lead the undercover agent back to Interstate 87, at which time Swartenburg entered a 2011 Subaru Legacy and escorted the agent back to the highway.  McLernon and Swartenburg were both arrested when Swartenburg returned and McLernon consented to a search of his properties at 367 and 369 West Saugerties Road as well as his 2012 Honda Accord.  During the search, both of the recently delivered hockey-style bags containing

marijuana were discovered.  Swartenburg's 2011 Subaru Legacy was also seized and a post-seizure search resulted in the recovery of $2,289 in United States currency and miscellaneous financial documents.

21.   In the summer of 2013, an informant was interviewed who indicated Dumas was responsible for organizing the transportation of marijuana coming from the Smith properties and was also responsible for coordinating the return of marijuana proceeds to the Smith properties.  The informant advised that Dumas was usually present at Smith's properties when the marijuana was picked up by the couriers.

22.   Within the plea agreement, the parties have entered into a non-binding stipulation that the defendant is accountable for more than 1,000 kilograms of marijuana.

**Victim Impact**

23.   There are no identifiable victims in this offense.

**Adjustment for Obstruction of Justice**

24.   The probation officer has no information indicating the defendant impeded or obstructed justice.

**Adjustment for Acceptance of Responsibility**

25.   On March 16, 2015, Rafter was interviewed at the Rensselaer County Jail while in the presence of Defense Attorney Benjamin Barry.  During the interview, the defendant was given the opportunity to review the "Factual Basis for Guilty Plea" section of the plea agreement.  He generally expressed agreement with the information contained therein, but did provide certain clarifications.  For example, Rafter took exception to being characterized as a "broker" of marijuana transactions.  Rather, the defendant described his role as largely being limited to determining the availability of co-conspirators Andrew Schueppel and Ralph Dumas to transport specific loads.  According to Rafter, Schueppel owned a farm that was situated on the Canadian side of the international border.  Schueppel would receive loads of marijuana (often delivered to him by Rafter) and then transport them to Lee Smith who owned a large parcel of land on the United States side of the border which was adjacent to Schueppel's property.  Smith would briefly store (or arrange for the storage) of the marijuana on his own property or the nearby property of his daughter until it was picked up by Dumas for delivery to customers at different locations throughout the northeastern United States.

26.   According to the defendant, an unnamed supplier from Montreal would contact him when a shipment was ready for transport to the United States.  Rafter would thereafter contact Schueppel and Dumas to determine if they were available to accept/transport the load.  If either were not available at the proposed time, the defendant indicates the shipment would be aborted or delayed as there were no others who completed these assignments.  Rafter denies having ever directed the activities of Schueppel or Dumas, but rather explains his involvement was limited to transporting the marijuana from Huntington, Quebec to Schueppell's property and determining the availability of Schueppel and

Dumas.  The defendant indicates he first met Schueppel in the early 1990s when the pair were neighbors (Schueppel has lived in the same house situated on the international border since that time).  The defendant has also known Ralph Dumas since he mid to late 1990s, as Dumas was a manager for Rafter's brother's (John McDonald's) trucking company.  Because Rafter knew both Schueppel and McDonald, the defendant opines he was approached to serve as the middleman between the two so that the Canadian participants did not know too much about the United States participants and vice versa. The defendant believes this would keep the Canadians better insulated from the threat of law enforcement investigations initiated by the United States authorities.

27. The defendant admits his involvement in the offense of conviction began in approximately 2004.  However, he recalls having only been involved in the transportation of one load of marijuana after 2010 -- that being the 100 pound load intercepted by law enforcement authorities in June of 2013.  While the plea agreement's factual stipulation indicates the defendant coordinated the delivery of marijuana loads, on average, several times per month for nearly a decade, the defendant clarifies that in addition to generally ending his involvement in 2010 that the delivers were highly sporadic and often seasonal. For example, he indicates that loads were often not shipped during the rainy or snowy seasons as the cross-border transport was too difficult.  Although he does not believe that shipments regularly occurred "several times per month" as alleged, he acknowledges the loads normally weighed between 100 and 150 pounds.  He also recognizes that he participated in the transportation of many such loads and therefore has no objection to the 1,000 kilogram stipulation contained within the plea agreement.

28. Rafter explains his participation in the instant offense was motivated by his desire to earn additional income during a time when his employment earnings were sporadic and limited.  He was reportedly paid $25 per pound and would therefore normally receive $2,500 to $3,000 for each load transported by the organization.  He was paid directly by the supply source from Montreal.  As a result of his activities being confined to the Canadian side of the operations, he reports being surprised to learn that he was a subject of this investigation which originated in the United States.  In short, he did not fully understand the scope of his accountability for what he believed to be a fairly minor role within the larger conspiracy.  The defendant recalls having met co-conspirator Lee Smith on one occasion after Schueppel had introduced the pair at the start of their involvement in the above-described smuggling activities.  Rafter does not know co-conspirators Stacie Demers, Robert Swartenburg, or James McLernon.

**<u>Offense Level Computation</u>**

29. The 2015 Guidelines Manual, incorporating all guideline amendments, was used to determine the defendant's offense level. U.S.S.G. §1B1.11.

**<u>Count 1</u>: Conspiracy to Possess and Distribute Marijuana**

30. **Base Offense Level:** The guideline for 21 U.S.C. § 846 offenses is found in U.S.S.G. §2D1.1(c)(5). That section provides that an offense involving between 1,000 kilograms and 3,000 kilograms of marijuana has a base offense level of 30.     **<u>30</u>**

31.   **Specific Offense Characteristics:**   Pursuant to U.S.S.G. §2D1.1(b)(15), the offense is to be increased by 2 levels if the defendant receives an aggravating role adjustment and the offense involved certain enumerated factors, to include, among others, the defendant's direct involvement in the importation of a controlled substance.  As such, the 2 level enhancement is appropriate.                **+2**

32.   **Victim Related Adjustment:** None.                                                                          **0**

33.   **Adjustment for Role in the Offense:** As outlined in the plea agreement's factual stipulation, "The defendant's primary role within the organization was to broker marijuana transactions … The defendant directly coordinated with the dealers to arrange a time and location for the delivery of marijuana loads.  The defendant also coordinated with the organization's couriers."  Furthermore, with regard to a specific marijuana load, the factual stipulation from the plea agreement outlines that, "On June 18, 2013, at the direction of the defendant, Dumas retrieved the load of marijuana from Demers' shed."  As supported by the details outlined in the plea agreement's factual stipulation, the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b); therefore, two levels are added. U.S.S.G. §3B1.1(c).                                                      **+2**

34.   **Adjustment for Obstruction of Justice:** None.                                        **0**

35.   **Adjusted Offense Level (Subtotal):  Thirty-four.**                                **34**

36.   **Chapter Four Enhancement:** None.                                                          **0**

37.   **Acceptance of Responsibility:** The defendant has clearly demonstrated acceptance of responsibility for the offense. Accordingly, the offense level is decreased by two levels. U.S.S.G. §3E1.1(a).                                                    **-2**

38.   **Acceptance of Responsibility:** It is anticipated the government will make a motion indicating the defendant timely notified authorities of his intention to enter a plea of guilty, thereby permitting the U.S. Attorney's Office to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently. Pursuant to U.S.S.G. §3E1.1(b), the offense level is reduced one additional level.                                                                                      **-1**

39.   **Total Offense Level:  Thirty-one.**                                                        **31**

## PART B. THE DEFENDANT'S CRIMINAL HISTORY

40.   The records of the following criminal history databases, police agencies and courts were checked for information about the defendant: New York State Division of Criminal Justice Services; National Crime Information Center; and the Canadian Law Enforcement Telecommunications System.  Unless otherwise noted, the defendant was represented by counsel, or knowingly waived the right to be represented by counsel.  These checks did not reveal any criminal history for the defendant.  Furthermore, when interviewed, the defendant denied any previous involvement with the criminal justice system.

**Juvenile Adjudication(s)**

41.    None.

**Adult Criminal Conviction(s)**

42.    None.

**Criminal History Computation**

43.    The total criminal history score is zero.  According to the sentencing table in USSG Chapter 5, Part A, a criminal history score of zero establishes a criminal history category of I.

## PART C. OFFENDER CHARACTERISTICS

**Personal and Family Data**

44.    This defendant, Archille ("Archie") John Rafter, age 52, was born on March 24, 1963 in Huntington, Quebec, Canada to the unmarried union of Jean-Ellie Hart and Evelyn Rafter.  The defendant's father, age 83, lives in Dundee, Quebec.  He has never held formal employment, but rather has always supported himself through hunting, fishing and trapping.  The defendant's mother passed away at the approximate age of 27 in 1972 as the result of carbon monoxide poisoning in an automobile.  According to Rafter, his mother's death was ruled accidental (as opposed to a suicide).  The defendant's infant sister (his youngest sibling) also passed away in this same incident.  The defendant indicates he and each of his siblings were placed with other families shortly after the death of his mother.  The children were placed separately and as a result, the defendant has never been especially close with his siblings.  Rafter did not have any contact with his biological father during the time period he was in foster care placements, but indicates he resumed occasional contact with his father during his late teens.  He continues to maintain occasional contact with his father.  Rafter does not maintain contact with any of his foster parents – as the foster parents with which he was closest passed away in the 1990s.

45.    The defendant has seven living siblings, each of whom continues to live in Quebec Province.  His siblings are as follows: Anne Kelly, age 54; Brenda Hickey, age 53; John McDonald, age 50; Beverly Lange, age 49; Lorraine Carrier, age 48; Antoine Carrier, age 47; and Bruce Hutchings, age 46.  Rafter indicates he is the only of his siblings that was not adopted.  According to the defendant, his brother John McDonald is the owner of a brokerage (trucking) company.  He was unable to provide background information about any of his other siblings.

46.    On September 17, 1988, after having dated for eleven years, the defendant married Kelly Rafter, nee: Johnson, now age 48, in Ellenburg, New York.  Johnson is originally from Franklin, Quebec and continues to live at the family home at 2250 1ˢᵗ Concession, Elgin, Quebec.  Most of her family lives in Quebec.  She is employed as a full time health care worker at a home for the elderly.  While she was visiting Rafter twice per week while he

was being detained at the Clinton County Jail, she has been unable to visit in recent months due to his transfer to Rensselaer County Jail.  However, they do continue to share daily telephone contact with one another.  This marriage resulted in the birth of three daughters.  Renay Rafter, age 26, lives in Huntington, Quebec.  She recently separated from her husband and has custody of their three year old son.  She is employed as a bookkeeper for a feed company.  Tracy Rafter, age 24, lives with her boyfriend in a second residence (described by the defendant as a winterized camp) on the family property in Elgin.  She is employed as a full time LPN.  Kelsey Rafter, age 20, recently graduated from a nursing program and is currently seeking employment.  She lives with her mother.  The defendant describes a close relationship and regular contact with each of his children.

47.     The defendant's wife was contacted by the Probation Office and she verified much of the information provided by the defendant.  She described him as a good father and husband, who is hard-working, loyal, dedicated, caring, helpful, and intelligent.

48.     The defendant is a lifelong resident of Quebec Province (the Huntington/Elgin areas), except for a one year period when he lived in Carstairs, Alberta during portions of 2000 and 2001.  He reports having moved to Carstairs with his family on the receipt of a promise for an excellent employment opportunity in Calgary, Alberta.  However, the employment opportunity did not work out as expected and he returned to Quebec after just one year in western Canada.

**<u>Physical Condition</u>**

49.     Rafter stands 5'8" tall, weighs 200 pounds, has brown eyes, and brown/greying hair.  Additional identifying characteristics include his use of prescription eyeglasses; a tattoo on his left shoulder depicting a Native American, an eagle, and a wolf; and surgical scars on his collarbone, right knee, right shoulder, and appendix.  It is also noted that he suffered a partial amputation of his thumb and ring finger on his right hand from a work-related injury in July of 2013.  More specifically, he was trying to unjam a feed auger when another employee turned the machine on and his hand got caught in the drive belt.

50.     The defendant also sustained injuries to his right shoulder and right knee while working as a farmhand during his early twenties.  With regard to his shoulder, he reports having suffered three dislocations during a short period of time while working on the farm.  He re-injured this same shoulder during a snowmobile accident a few years ago.  Rafter has suffered from acid reflux for several years.  He reports having taken 20 milligrams of Omeprazole (Prilosec) for approximately ten years prior to his incarceration for the instant offense and found that medication to be effective.  However, since his incarceration, medical staff at the jail has switched him to Zantac, and he does not believe the later medication to be as effective.  He does not regularly take any other prescription medications and denies the history of any physical restrictions or disabilities.

**Mental and Emotional Health**

51.     Rafter denies the history of any mental health problems or the treatment for such problems.  While he acknowledges his current incarceration has been difficult, he feels he is doing as well as can be expected under the circumstances.  He appears to be of average intelligence and articulates in that capacity.  Rafter is not aware of the history of mental health problems within his family.

**Substance Abuse**

52.     When interviewed, the defendant admitted the history of alcohol, marijuana, and cocaine use.  Specifically, he began drinking alcohol at the age of 18 and continued to drink a couple of times per week until his arrest for the instant offense.  While he would generally consume just a couple of drinks per occasion, he would sometimes consume as many as eight to ten beers per occasion.  For a short period of time in the 1990s he was drinking daily due to financial problems, but quickly got out of this pattern of daily drinking.

53.     Rafter first smoked marijuana in his late teens and last did so a couple of years ago.  He was reportedly never a regular user of marijuana and indicates it was not unusual for him to go several years without smoking.  He denies having ever been a regular user of marijuana and notes that the drug made him paranoid.

54.     The defendant reports having snorted cocaine on approximately six occasions during his early twenties.  He describes the quantity used as minimal on each occasion.

55.     Rafter does not believe his use of alcohol or drugs was ever problematic.  He has never participated in a drug or alcohol treatment program.  The defendant is not aware of the history of any substance abuse within his family.

**Educational, Vocational and Special Skills**

56.     The defendant graduated from Chateauguay Valley Regional High School, Quebec at the approximate age of 18.  He was enrolled in the vocational program and studied small engine repair and auto mechanics.  The defendant also has several years of experience as a heavy equipment operator and previously was the holder of a commercial driver's license which expired on March 24, 2014.  He is fluent in English and French.

**Employment History**

57.     From 2012 until his arrest in October of 2013, the defendant was a delivery driver for Faubert Feeds, Trout River, Quebec.  While he was initially hired as a relief driver, which resulted in highly variable hours and earnings, just prior to his arrest for the instant offense he had leased a tractor trailer and signed a contract with Faubert Feeds wherein he would earn a minimum of $5,000 per month from this employment.  The defendant believes his former employer will allow him to return to work following his release from custody.

58.     For more than a decade prior to his arrest, the defendant also owned his own excavation company. His equipment included an excavator, backhoe, and dump truck. His hours and earnings were highly variable through this employment as well. He was unable to estimate his earnings.

59.     As noted above, the defendant worked as a farmhand for a couple of years in his early twenties. Otherwise, his employment history has always involved working as a truck driver or heavy equipment operator. He has not experienced any lengthy periods of unemployment since his early twenties.

### Financial Condition: Ability to Pay

60.     In a sworn personal financial statement, the defendant and his wife reported assets totaling approximately $469,573, to include the fair market value of their home at 2250 1st Concessions, Elgin, Quebec, worth an estimated $400,000, a late model John Deere 4620 tractor worth an estimated $25,000, a 2013 Volkswagen Jetta automobile worth an estimated $20,000, a 2008 Dodge Ram 1500 pickup worth approximately $15,000, a Retired Registered Savings Plan (401K-type retirement account) at Caisse Desjardines Bank with a $6,500 balance, a 2005 Volkswagen Jetta worth approximately $2,500, and a Caisse Desjardines savings/checking account with a balance of $573. Conversely, the Rafters report debt of $116,830, to include a mortgage balance of $76,548, a line of credit with Caisse Desjardines Bank with a balance of $21,652, $11,000 still owed in legal expenses for representation in connection with this case, her student loan owed to Revenue Quebec with a balance of $6,183 (which is deferred until 2014), a Caisse Desjardines Visa with a $1,060 balance, and an American Express with a $387 balance. This results in a net worth of $352,743.

61.     Rafter has been detained since October 25, 2013. Therefore, an analysis of his income and expenses was not conducted.

62.     It is noted that Rafter is represented by retained counsel (he and his wife did not know if any payments would be required beyond the initial retainer). Based on the above financial profile, it appears the defendant may have the ability to pay a fine and/or costs.

## PART D. SENTENCING OPTIONS

### Custody

63.     **Statutory Provisions:** The minimum term of imprisonment on Count 1 is 10 years and the maximum term is life. 21 U.S.C. § 846 and 21 U.S.C. § 841(b)(1)(A). This offense is a Class A Felony.

64.     **Guideline Provisions:** Based upon a total offense level of 31 and a criminal history category of I, the guideline imprisonment range is 108 months to 135 months. However, as the statutorily authorized minimum sentence of 10 years is greater than the minimum of the guideline range, the guideline range is 120 months to 135 months. U.S.S.G. §5G1.1(c)(2).

65.     In Zone D, the minimum term shall be satisfied by a sentence of imprisonment. U.S.S.G. §5C1.1(f).

        **Impact of Plea Agreement**

66.     None.

        **Supervised Release**

67.     **Statutory Provisions:**  The Court must impose a term of supervised release of at least five years. 21 U.S.C. § 841(b)(1)(A).

68.     **Guideline Provisions:** The guideline range for a term of supervised release in Count 1 is five years to life. U.S.S.G. §5D1.2(c).

        **Probation**

69.     **Statutory Provisions:**  The defendant is ineligible for probation because it is expressly precluded by statute. 21 U.S.C. § 841(b)(1)(A).

70.     **Guideline Provisions:** The defendant is ineligible for probation on Count 1 because probation has been expressly precluded by statute. U.S.S.G. §5B1.1(b)(2).

        **Fines**

71.     **Statutory Provisions:**  The maximum fine is $10,000,000. 21 U.S.C. § 841(b)(1)(A).

72.     A special assessment of $100 is mandatory. 18 U.S.C. § 3013.

73.     **Guideline Provisions:** The fine range for this offense is $15,000 to $10,000,000. If the defendant is convicted under a statute authorizing (A) a maximum fine greater than $250,000, or (B) a fine for each day of violation, the Court may impose a fine up to the maximum authorized by the statute. U.S.S.G. §5E1.2(c)(4).

74.     Costs of prosecution shall be imposed on the defendant as required by statute. U.S.S.G. §5E1.5. In determining whether to impose a fine and the amount of such fine, the Court shall consider, among other factors, the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed. U.S.S.G. §5E1.2(d)(7) and 18 U.S.C. §3572(a)(6). These costs may include drug and alcohol treatment, electronic monitoring, and/or contract confinement costs. The most recent advisory from the Administrative Office of the United States Courts, dated June 24th 2014, provides the following monthly cost data:

|         | Imprisonment in Bureau of Prisons Facilities | Community Correction Centers | Supervision by Probation Officers | Supervision by Pretrial Services Officers | Pretrial Detention |
|---------|---------|---------|---------|---------|---------|
| **Daily**    | $80.25      | $72.91      | $8.66      | $7.17      | $74.61      |
| **Monthly**  | $2,440.97   | $2,217.73   | $263.50    | $218.23    | $2,269.41   |
| **Annually** | $29,291.62  | $26,612.76  | $3,162.03  | $2,618.70  | $27,232.95  |

### Restitution

75.   **Statutory Provisions:** Restitution is not applicable in this case. 18 U.S.C. § 3663.

76.   **Guideline Provisions:** Restitution is not applicable in this case.

### Denial of Federal Benefits

77.   **Statutory Provisions:** At the discretion of the Court, the defendant, having been convicted of a first drug distribution offense, shall be ineligible for any or all federal benefits for up to five years after such conviction. 21 U.S.C. § 862(a)(1)(A).

78.   **Guideline Provisions:** The Court, pursuant to 21 U.S.C. § 862, may deny the eligibility for certain Federal benefits of any individual convicted of distribution or possession of a controlled substance. U.S.S.G. §5F1.6.

## PART E. FACTORS THAT MAY WARRANT DEPARTURE

79.   The probation officer has not identified any factors that would warrant a departure from the applicable sentencing guideline range.

## PART F. FACTORS THAT MAY WARRANT A SENTENCE OUTSIDE OF THE ADVISORY GUIDELINE SYSTEM

80.     The probation officer has not identified any factors that would warrant a sentence outside of the advisory guideline system.


Respectfully Submitted,

Matthew L. Brown
Chief U.S. Probation Officer

/s/

By:     Edward M. Cox
        Senior U.S. Probation Officer

Approved:

s/ Craig F. Penet
Supervising U.S. Probation Officer

## ADDENDUM TO THE PRESENTENCE REPORT

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK
## UNITED STATES V. ARCHIE RAFTER, Docket No. DNYN8:14CR000360-001

On March 25, 2015, the presentence report was disclosed to Assistant U.S. Attorney Katherine E. Kopita and Benjamin S. Barry.  As of the below date, neither Ms. Kopita nor Mr. Barry have advised of any objections to the report.


                                    Respectfully Submitted,

                                    Matthew L. Brown
                                    Chief U.S. Probation Officer


                                    /s/

                          By:    Edward M. Cox
                                    Senior U.S. Probation Officer

Approved:

s/ Craig F. Penet
Supervising U.S. Probation Officer

April 24, 2015

**SECOND ADDENDUM TO THE PRESENTENCE REPORT**

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**
**UNITED STATES V. ARCHIE RAFTER, Docket No. DNYN8:14CR000360-001**

Following the initial disclosure of the presentence report, Rafter retained Defense Attorney Daniel DeMaria to represent him for sentencing matters.  On September 14, 2015, Mr. DeMaria submitted a letter which contained a number of clarifications/objections to the presentence report.  A teleconference was held on October 2, 2015 which included Mr. DeMaria, Assistant U.S. Attorneys Katherine E. Kopita and Cyrus Rieck, Supervising U.S. Probation Officer Craig F. Penet, and U.S. Probation Officer Edward M. Cox.  As a result of Mr. DeMaria's written submission and the arguments presented during the teleconference, revisions were made to the face sheet as well as paragraphs 44, 51, 56, and 57 of the presentence report.  The unresolved clarifications/objections are addressed below.

**<u>OBJECTIONS</u>**

**<u>By the Government</u>**

The Government has no objection to the factual information or guideline computations contained in the presentence report.

**<u>By the Defendant</u>**

Given that the sentencing has been adjourned past November 1, 2015, Defense Counsel indicates Rafter's offense level computation should be re-calculated using the 2015 Guidelines Manual, once that manual is released.  He reserves the right to object to the guideline calculations at that time.

With regard to paragraph 26, Rafter indicates he was told by the organizers, leaders, managers, and/or supervisors of this organization that it was set up in such as way so as to keep the Canadians better insulated from the threat of law enforcement investigations initiated by the United States authorities.  The defendant asserts he took no part in establishing the organization or structuring the organization in any particular way.   The defendant further states that his role was that of a messenger, and he would convey messages from an unnamed supplier from Montreal to Schueppel and/or Dumas as instructed by the unnamed source in Montreal.

With regard to paragraph 28, the defendant objects to the characterization that his involvement was motivated by, "his desire to earn additional income."  Rather, he states his actions were due to desperation to earn money after he lost everything when he lived in Western Canada as noted in paragraph 48 of the presentence report.

With regard to paragraph 33, the defendant states he was not an "organizer, leader, manager, or supervisor in any criminal activity," and that the two level enhancement set out at U.S.S.G. §3B1.1(c) does not apply.

With regard to paragraph 50, the defendant indicates that the jail is forcing him to take 40 milligrams of Omeprazole (Prilosec), because the Government and/or the jail will not pay for the 20 milligram dose which he truly needs.   The defendant is concerned that he will get Osteoporosis as a result of the dose being too high.  The defendant further states he needs an MRI on his right knee and right shoulder, and that he sleeps in pain as a result of only having one mattress.  Previously, while detained at the Clinton County Jail, the defendant was prescribed an additional mattress, something which the Rensselaer County Jail refuses to do.

Rafter further states with respect to paragraph 50, he is 15% disabled on his right side, including his collar bone, his shoulder, and his knee.  He also reports having been advised at the Clinton County Jail that he is developing arthritis in his left shoulder and right knee.  He also had a tooth extraction four or five years ago due to gum disease and as a result has a partial denture for some of his bottom teeth.

With respect to paragraph 52, the defendant indicates he does not drink a couple of times per week, nor did he do so prior to his incarceration.  In this regard, Rafter states he is a commercial truck driver who logged at least 1.5 million miles without a single alcohol related incident.  Prior to his arrest, he drank socially (i.e. not to get drunk) approximately once per week – usually on a Friday or Saturday at which time he would consume an average of three to four beers.

With respect to paragraph 53, Rafter indicates he was drug tested as part of his employment in September of 2013 and tested negative for marijuana.  He denies having last smoked marijuana a couple of years ago, though he admits he was at a party in 2010 or 2011 were he took a puff from a joint.  Prior to that incident, the defendant rarely, if ever, used marijuana, both due to the fact that marijuana made him paranoid and because he simply did not enjoy it.  According to the defendant, the assertion he rarely used marijuana is confirmed by the fact he was routinely drug tested as part of his employment as a commercial driver and always tested negative.

With respect to the analysis of his ability to pay a fine, the defendant notes that the exchange rate for Canadian/United States currency had fallen to one Canadian dollar being worth just $.75 as of mid-September of 2015.  Relatedly, Rafter objects to the Probation Office's conclusion that, "it appears the defendant may have the ability to pay a fine and/or costs."  More specifically, he relates his wife is slowly depleting their savings while he is incarcerated, and has been trying to sell the family home without success.

### Response by U.S. Probation Officer

The 2015 edition of the Guideline Manual has been reviewed and is reflected in the revised presentence investigation report.   There are no changes which would affect this offense.

The Probation Office and the Government maintain the 2 level aggravating role enhancement contained at paragraph 33 is applicable.  The basis for this enhancement is contained in the Plea Agreement's stipulation of fact (the essential facts are restated in paragraph 33 of the presentence report).  However, should the Court find Defense Counsel's argument against the aggravating role enhancement compelling, it is noted there are impacts on the Guideline computations that have not yet been raised by Defense Counsel.  More specifically, elimination of the aggravating role enhancement would also result in removal of the 2 level increase at paragraph 31, which is

based on the application of U.S.S.G. §2D1.1(b)(15).  Furthermore, elimination of the aggravating role enhancement would also appear to qualify Rafter for the 2 level "Safety Valve" reduction contained at U.S.S.G. §2D1.1(b)(17).  Therefore, should the Court find that the aggravating role enhancement is not applicable, it would appear the Total Offense Level would decrease by a total of 6 levels (through the elimination of the 2 level enhancements contained at paragraphs 31 and 33 and the applicability of the 2 level "Safety Valve" reduction).  Should the Court find that the organizer, leader, manager, or supervisor enhancement is not appropriate, the resulting Total Offense Level would be 25, which at Criminal History Category I, yields a Guideline Range of 57 to 71 months.  (The 120 month mandatory minimum would no longer be applicable as a result of the Safety Valve applicability).

With regard to the clarifications provided by the defendant in connection with paragraphs 52 and 53 (summarizing his past alcohol and marijuana use), the Probation Officer has reviewed his notes from the interview and asserts the information contained in those paragraphs is an accurate representation of the information elicited during the interview with the defendant (which was conducted on March 16, 2015 in the presence of prior defense attorney Benjamin Barry).

Respectfully Submitted,

Matthew L. Brown
Chief U.S. Probation Officer

/s/

By:   Edward M. Cox
      Senior U.S. Probation Officer

Approved:

s/ Craig F. Penet
Supervising U.S. Probation Officer

October 27, 2015